Doug Passon
Law Offices of Doug Passon, PC
10565 N. 114th St., Suite 101
Scottsdale, AZ 85259
Telephone: 480.448.0086
Email: doug@dougpassonlaw.com

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>CAMERON MONTE SMITH,<br><br>                    Defendant. | CASE NOS.  1:23-CR-118 (ND) and<br>                    1:24-CR-104 (SD)<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>COURT: Hon. Daniel M. Traynor |

        Defendant CAMERON MONTE SMITH, by and through undersigned counsel hereby provides the Court with the instant Sentencing Memorandum and also moves this Court for a downward variance from the advisory sentencing range as determined by this Court.  For the reasons set forth below, Mr. Smith, a 50-year-old first-time offender and Canadian Citizen with Autism Spectrum Disorder ("ASD") suffering from Crohn's Disease and failing eyesight, respectfully requests that this honorable Court impose a sentence of no greater than 36 months' imprisonment, no fine, no term of supervised release, and an appropriate amount of restitution. While detained for the past 20 months, Mr. Smith has maintained a clean disciplinary record, has accepted full responsibility for his conduct, while being deprived of any meaningful programming opportunities.

        A 36-month sentence is significant and will be far more onerous for Mr. Smith than for a typical defendant. Moreover, for purposes of sentencing parity, such a sentence is slightly *more* than what those similarly situated have received. And unlike citizens, Mr. Smith will not be able to reduce his sentence through earning First Step Act credits.

        In stark contrast, the Government's recommendation of 151-months' imprisonment—which constitutes a 100-month upward departure—could very well amount to a *de facto* life sentence for Mr.

Smith. Although the government works hard to stretch the Guidelines far beyond their appropriate application, Mr. Smith is far from a terrorist. After all, "the concept of terrorism has a unique meaning and its implications risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act." *People v. Morales*, 20 N.Y.3d 240, 249, 982 N.E.2d 580, 586, 958 N.Y.S.2d 660, 666 (2012). Indeed, the Government's proposed sentence is far greater than the median sentences in Criminal History Category I for such serious offenses as arson (41 months), manslaughter (60 months), child pornography (78 months) and even kidnapping (120 months).[1] More importantly, a 151-month sentence is higher than any sentence imposed on those similarly situated to Mr. Smith over the past five fiscal years.

# I. INTRODUCTION AND BACKGROUND

*A.    History and Characteristics of Cameron Smith*

Cameron Smith is a "kind, compassionate person, and deeply caring person" who would "never deliberately put anyone in harm's way." *See* Ex. 1, Letters of Reference, Caroline Karvonen & Francis Bedell. He is a hard-working, intelligent person, who is committed to protect and provide for not only the people closest to him in life, but for the planet and all of its inhabitants. However, he is also a man who struggles mightily with, among other issues, the pervasive developmental disorder, ASD. As Dr. Geller's report and her testimony at trial makes clear, ASD played a significant role in the bad decisions he made that resulted in his federal prosecution. Ex. 2, Report of Lynda Geller, Ph.D. ("Geller Rpt.").[2]

Cameron's early life was rather idyllic. He came from a close-knit family. His father's career as manager of the Bank of Nova Scotia allowed him to spend his first eight years growing up in beautiful nature, such as the Cayman Islands. During his travels, he developed a fond appreciation for being outdoors and all that nature had to offer.

---

[1] *See* U.S. Sentencing Comm'n, *2023 Sourcebook of Federal Sentencing Statistics* tbl. 27, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table27.pdf.

[2] All exhibits hereto are filed under seal as part of the supplement to the instant sentencing memorandum.

DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE VARIANCE

 

At the age of 12, things took a dramatic turn for the worse, when Cameron was diagnosed with Crohn's disease. This caused him to be home-bound during crucial years of social development. While the complexities of his disease took center stage, the so-called "hidden disorder" of ASD went undiagnosed and therefore untreated. His parents attributed his social isolation and other odd personality traits as outcomes of his Crohn's. Moreover, because Cameron was intelligent, curious, studious, and motivated, nobody felt the need to dig any deeper into other areas of his functioning, or better stated,

 

lack of functioning.  *See* Transcript of Sentencing Hearing, Day 2, at 211-12.   In addition, our collective lack of understanding when Cameron was a child resulted in him not being diagnosed until late in life. *Id.*  Consequently, as the years went by, he became more socially dysfunctional, and more isolated.

Because of his rigid thinking, his social awkwardness, and other issues, Cameron has had very few long-lasting and meaningful relationships outside of his immediate family.  He has made efforts at romantic relationships, but those often are short-lived.  Beyond that, his social interaction consists of online relationships he has cultivated, especially with those working to peacefully advocate for climate change.

In 2020, things took an even darker turn.  Cameron's father, with whom he was very close, passed away from complications of Alzheimer's disease.  He could not attend his funeral due to Covid.



By 2024, he found himself profoundly isolated, having ended a several year relationship with Marie Smith, his father gone, his work drying up, and his mother and sister back in Canada he spent an inordinate time online and focused on the existential threat of climate change.

Of course, his passion for combatting climate change was not new.  For years he had been donating money to lawful organizations, researching the issues, and communicating ideas to change-makers in this space.   He even came up with a plan he called, a "grand bargain" meant to persuade Congress to pass meaningful climate change legislation. Gov't Ex. 12.   After exhausting all lawful means and ideas, and having no one around him to ground him, distract him, and help him manage his perseverations, he finally arrived at the ill-conceived plan to vandalize two energy facilities with the

1  goal of bringing attention to what all of his research convinced him was an existential threat to

2  humanity.  Thus, although he understands and fully admits his actions were unequivocally wrong, his

3  motivations were never meant to cause fear or to intimidate or coerce anyone..  To the contrary, in his

4  mind, his ill-conceived plan was meant to prevent the chaos and devastation caused by climate change.

5  See, e.g., Geller Rpt., at 22-23; See Infra, Section II (Nature & Circumstances of the Offense).

6      Now that Mr. Smith and his family fully understand that Cameron is on the Autism Spectrum,

7  they can better assist him in finding tools and resources to help him live a productive life.  Both his

8  mother and sister will welcome him with open arms back home when he has finished serving his

9  sentence.   Being reunited with his family will not only be beneficial for Cameron, but also for his

10  mother, who lives alone and is still grieving the loss of her husband.  Family reunification, combined

11  with therapeutic interventions for Cameron will go far to fix that which is not fully functioning in his

12  life.



*Family Photo Prior to Monte Smith's Passing*

21      As much as he wishes he could take back his actions, he realizes that the case marks a turning

22  point in his life, in that he now has a much better handle on his limitations and how to go about addressing

23  them.  He fully intends to do so, which is just one more way Cameron Smith will prove to this Court that

24  he is truly remorseful for his conduct.

25      B.    *Nature of the Offense Conduct*

26      As reflected in great detail in Dr. Geller's report and expounded upon during her testimony at the

27  first phase of this sentencing proceeding, Cameron Smith's autism is deeply relevant and mitigating.

28  Ex.1, Geller Rpt; Hearing Transcript, Day Two, January 28, 2025 ("Day Two Transcript").  Of course,

ASD does not excuse Mr. Smith's behavior. However, understanding what autism is, how it impacts Mr. Smith, and how it is connected to his bad decision making is crucial to put these offenses in the proper context.   In short, Cameron's Smith's ASD renders him far less culpable than otherwise similarly situated defendants.

There can be no dispute that ASD, "is a lifelong, neuro-developmental disorder characterized by challenges with social communication and interaction, and the presence of narrow or restrictive behaviors and interests."   A false premise associated with "high functioning" autism (or "Asperger's") is the belief that autistic individuals like Mr. Smith who have high intelligence do not have serious impairments.  The DSM-5 dispenses with this common misconception, stating, "[e]ven those with average or high intelligence have an uneven profile of abilities. The gap between intellectual and adaptive functional skills is often large."

As Dr. Geller describes, the most common and significant hallmarks of ASD are rigid thinking and lack of executive functioning. Geller Rpt. at 14, 21.  Another common characteristic is to "hyperfocus" on a specific area of interest.   For some it may be trains, or world history.  Others may possess an encyclopedic knowledge of dinosaurs.  For Cameron Smith, we know, among other areas of "high interest" is the environment.

An even bigger problem directly tied to "hyperfocus" is "inflexible thinking" or lack of ability to engage in "mental shifting".  When Mr. Smith set his mind on this ridiculous solution to a very real problem, his Autism significantly impaired his ability to shake that off and find another solution. Indeed, Dr. Geller ranks his rigid thinking to be in the lowest one percentile.  Geller Rpt. at 21. Along the same lines, because of his ASD, which is a frontal lobe disorder affecting executive functioning, Cameron's "problem solving" abilities rank in the lowest seven percent of the population.  Geller Rpt. at 17.  Thus, unsurprisingly, his "solution" to the problem of climate change, was a terrible one.

At the last hearing, the parties spent significant time attempting to assess what Cameron Smith was thinking – i.e. his "motivation".  Indeed, that is the central question of the "terrorism enhancement". Hopefully the irony is not lost that this endeavor, discerning mental states of others, is one of the main deficits attendant to ASD.  That is because those on the spectrum cannot engage in "theory of mind" or "perspective taking".  Another term for this is "mind blindness."  Geller Rpt. at 6, 21, 23, & 26;  Day

Two Transcript at 210-218 ("That is often how people [with ASD] get in trouble with the law.")  Thus, there can be no dispute that because of his disability, one of Cameron's greatest struggles is determining how others will react or feel about in response to things he says or does.  This explains why his belief about how others might react to his shooting at power stations was so misguided.

The reason the Court expressed doubt that Cameron's true motivation was to create awareness, is precisely because the Court is capable of doing exactly what Cameron is not – logically and rationally predicting and discerning how others will react to his words or conduct.   Cameron's belief that what he did would draw attention and more importantly, cause the public to care more about climate change was absurd. However, that does not negate the truth of his asserted motivation.   He sincerely believed he was preventing the chaos of climate change, not creating chaos.  This, of course, is not how most people would view this, and certainly not how the government is viewing it now.   This disconnect as to how an autistic brain might view a set of circumstances versus a neurotypical brain is a textbook example of mind-blindness. *See id*.

Theory of mind and rigid thinking also ties to another of Cameron's major deficits—the ability plan and predict outcomes, which is another hallmark of executive functioning.  Geller Rpt.  at 8-10.  Mr. Smith was unable to engage in the essential exercise of anticipating the real-life consequences of his actions – not just for the power companies, but for himself and for those that love him.  Had he been able to foresee the pains he would suffer during incarceration, the embarrassment and fear he caused his mother and sister, deportation, the loss of all of his savings fighting the case and making victims whole, he likely would have made very different decisions.  However, it is clear he wasn't thinking realistically, rationally, or functionally about *any* real-world consequences of his actions.  Again, that's Autism in a nutshell.  This, of course, distinguishes him from almost every other defendant who has been convicted and sentenced for similar conduct.

## II.  NEITHER USSG §3A1.4 NOR APPLICATION NOTE 4 APPLY

Mr. Smith incorporates herein by reference his Memorandum of Law Regarding Application Note 4 to USSG §3A1.4, Loss & Restitution (ECF Doc. 116) and his Reply to United States' Response to same (ECF Doc. 121).  In further support, at the evidentiary hearing, this Court directed Mr. Smith to address how his conduct was "trying to influence a civilian population," Hearing Trans. at 247:16, as

opposed to "the United States Government because you're impacting the essential infrastructure of a country doing that." *Id.* at 247:22-24.  Respectfully, it is neither.  At most, Mr. Smith's conduct constituted vandalism toward a private company, which he irrationally and wrongly believed would raise awareness regarding the climate change crisis.  There simply was no evidence adduced at the evidentiary hearing that Mr. Smith's conduct was "***calculated***" to either "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *United States v. Mohamed*, 757 F.3d 757, 759 (8th Cir. 2014) (emphasis added), or "to intimidate or coerce a civilian ***population***." USSG §3A1.4, comment. (n.4) (emphasis added).

At the hearing, it was first established how complex the electric grid is.  When Stephen Peterson, the division manager of substations dispatch and security for Mountrail Williams Electric Cooperative, was asked whether the electricity from the Wheelock Substation fed the DAPL pipeline, he answered: "Not necessarily."  Hearing Trans. at 134:10. According to him, "[t]he way that the grid is connected, there's transmission and distribution. So the transmission would be connected between substation to substation. The distribution on the low side of the transformer isn't necessarily connected. ***It's hard to explain.***" Hearing Trans. at 134:10-14 (emphasis added).

Likewise, when the Court inquired of Mark Hoffman, the COO for East River Electric Power Cooperative, "is there any way that someone not connected with East River Power Cooperative would know that this substation served Trans-Canada pipeline?," *id.* at 159:13-16, Mr. Hoffman responded "Other than it's a pumping station, I don't know that there's a sign at the location that says Trans-Canada site." *Id.* at 159:17-19.

In short, the Government did not adduce any evidence from any witnesses that Mr. Smith calculated his conduct to disrupt DAPL or any other pipeline, let alone the customers served by those substations. In that regard, given the complexity of the electric grid, including the fact that the power companies have in place infrastructure to "back feed" power to their customers when a disruption occurs, *id.* at 129:9-15, there simply was no way Mr. Smith could have calculated his conduct to target any entity other than the private companies operating the substations. Even employees of these substations could not explain the complexity of the distribution and transmission of electricity from these substations to any particular end users.

1    In that regard, this Court's inquiry regarding the map found among Mr. Smith's personal effects

2  unequivocally also demonstrated that he could not have used that to plan to disrupt any particular

3  pipeline.  This Court asked of Mr. Hoffman, "somebody in possession of this map wouldn't necessarily

4  be able to use it to go to your site because your pipeline's not reflected, right?" *Id.* at 163:7-9.  Mr.

5  Hoffman responded: "Correct." *Id.* at 163:10. In sum, there was no evidence adduced at the two-day

6  evidentiary hearing—let alone a preponderance of the evidence—that Mr. Smith **calculated** his conduct

7  to coerce or intimidate either the Government or a civilian population.  The APA is not to the contrary.[3]

8    Finally, no evidence was adduced that Mr. Smith wrote, let alone was influenced by, the

9  Communique.  It was a document from years prior, and one that was never even saved on Mr. Smith's

10  computer.  It was written by a group no longer in existence.  The evidence surrounding the communique

11  and it's influence was pure speculation.  Although the government seeks to rely heavily on the presence

12  of spraypainted graffiti outside the energy stations, this too was highly speculative.  There was zero

13  evidence showing when the graffiti was written, and because the stations are unmanned, they may not

14  have been inspected for as much as thirty days.  Police arrested Mr. Smith shortly after committing the

15  offense.  As such, he should have literally been caught "red handed".  However, investigators found no

16  hint of spray paint on him, in his car, in the dumpster, in his hotel room at his home. All the evidence did

17  show was that Mr. Smith went out of his way to vandalize two substations at night and far off the beaten

18  path of humanity.

19

20    **III. A DOWNWARD VARIANCE IS WARRANTED**

21  *A.    The Government's Requested Sentence Constitutes a* De Facto *Life Sentence*

22    The Government requests this Court to impose a 151-month sentence of imprisonment on Mr.

23  Smith, which constitutes a 100-month upward variance. ECF Doc. 130 at 19.  Such a sentence could

24  very well amount to a *de facto* life sentence, given the adverse effects of incarceration on his life

25  expectancy.

26    According to an oft-cited, published and peer-reviewed study by Dr. Evelyn J. Patterson, there is,

27

28  [3] On page three at paragraph 4(e), Mr. Smith concedes that the substation serves the Keystone
Pipeline, but he does not concede that he was aware of this or that his conduct was calculated to disrupt
its operation. Indeed, as discussed herein, there is no way Mr. Smith could have known that.

on average, "a 2-year decline in life expectancy for each year served in prison."[4] Dr. Patterson's findings are consistent with findings by the U.S. Department of Justice itself.[5] Mr. Smith is now 50.4 years old, and was 48.6 when first detained in 2023. According to the Social Security Administration, Mr. Smith has a life expectancy of 82.2 years.[6] Of course, this does not take into consideration Mr. Smith's extended incarceration, nor does it take into account his serious health issues. The chart on the following page, therefore, applies Dr. Patterson's study to illustrate Mr. Smith's loss of two years of life expectancy (orange line) for every year of his imprisonment (blue line), which began in 2023.

　　　　As illustrated by where the lines intersect, Mr. Smith is not expected to survive beyond 2031.  If this Court were to impose a 151-month sentence, assuming he receives the customary 15% good conduct time reduction and at least 21-months' credit for his pretrial detention, then he will have approximately another nine years (108 months) to serve. Meaning, his projected release date will be sometime in 2034—three years beyond the time he is expected to die at approximately 60 years of age.

　　　　Notably, but for his incarceration, Mr. Smith would be expected to live until he was 82.2 years of age (green line).[7] Thus, statistically speaking, should Mr. Smith die around the time he turns 60, in addition to the approximate ten years and eight months of liberty he will have lost while imprisoned, he also will have lost an additional 22 years of life he otherwise would have had.  Death by imprisonment is far from a parsimonious sentence: in fact, it would be cruel and unusual.

---

[4] See Evelyn J. Patterson, *The Dose Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. Pub. Health 523 (2013), available online, https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148 (cited in support in, *inter alia*, *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017); *State v. Haag*, 198 Wn.2d 309, 329, 495 P.3d 241, 251 (Wash. 2021); *People v. Contrearas*, 4 Cal. 5th 349,362-63 (Cal. 2018); *People v. Wines*, 323 Mich. App. 343, 351 n.6 (Mich. 2018)).

[5] U.S. Dept. of Justice, Nat. Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 9-10 (2004), https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf (stressing that incarceration intensifies health problems and accelerates aging processes).

[6] *See* Social Security Administration, *Period Life Table, 2017, as used in the 2020 Trustees Report*, https://www.ssa.gov/oact/STATS/table4c6_2017_TR2020.html.

[7] *See* Social Security Administration, *Retirements & Survivors Benefits: Life Expectancy Calculator*, https://www.ssa.gov/cgi-bin/longevity.cgi (last visited Feb. 10, 2025).



*B.   A 151-Month is Nowhere Close to What Defendants Convicted of Violating 18 U.S.C. § 1366(a) or Otherwise Similarly Situated Typically Receive*

1.   <u>The Government's Cherry-Picked Cases Do Not Support a 151-Month Sentence</u>

In its sentencing memorandum, the Government cherry-picks six cases involving violations of 18 U.S.C. § 1366(a), and from there makes the demonstrably false assertion that "a 151-month sentence is within the range of sentences imposed by other courts around the country for violations of 18 U.S.C. § 1366(a). ECF Doc. 130 at 18. Each of these cases is easily distinguishable.  The defendants either had Guidelines calculations that were much higher than Mr. Smith's, had significant criminal history (or both), were subject to a mandatory minimum penalty, were sentenced during the pre-*Booker* era, or had assented to the particular sentence imposed as part of a binding plea agreement.

For example, in the *Clendaniel* case, the defendant and a conspirator planned "to attack multiple transformers at electrical substations that were located in 'a ring around Baltimore.' . . . [They] intended to cause massive economic losses and a 'cascading failure' of the electrical grid that would 'permanently completely lay this city to waste.'" *United States v. Clendaniel*, 1:23-cr-00056, USA Sent. Memo. at 2 ECF Doc. 156 (D. M.D. Sept. 11, 2024). The defendant was recorded telling her co-conspirator that "[i]f we could do all these in a day …It would completely destroy this whole city… You

1    know, what I'm talkin' about doin' … we need to make sure we destroy those cores, not just leak the oil

2    … a good four or five shots like through the center of 'em …should suffice; like should, you know,

3    make that happen …Like it would pro…, probably permanently completely law this city to waste." *Id.*

4    at 1-2.  Had defendant successfully completed her offense, the Government estimated it would have

5    resulted in over $75 million in damages.  *Id.* at 3.  According to the Government, "the defendant

6    engaged in a deliberate and calculated scheme to destroy critical infrastructure with the goal of creating

7    societal chaos to further a ***white supremacist ideology.*** The fact that she had just recently served a

8    lengthy term in prison following multiple convictions for violent crimes, including robbing a

9    convenience store with a machete, plainly did not rehabilitate the defendant or deter her from continuing

10   to engage in criminal conduct.  Indeed, Clendaniel committed the very serious crimes in this case barely

11   a year after her release from the halfway house in 2021." *Id.* at 9.

12          Not surprisingly, the defendant's Total Offense level was 45 (which was capped at 43 by

13   operation of the Guidelines) and she was in Criminal History Category VI.  *United States v. Clendaniel*,

14   1:23-cr-00056, USA Sent. Memo. ECF Doc. 156 at 5-6 (D.M.D. Sept. 11, 2024).  As a result, the

15   defendant's advisory "range" was the total statutory maximum penalty of 35 years (420 months).

16   Moreover, apart from the fact she received USSG §3A1.4 outright (and not an upward departure), as

17   noted above the defendant had "an extensive criminal history." *Id.* at 9.  Notwithstanding that the

18   Guidelines called for 35 years' imprisonment, the Government requested a significant *downward*

19   variance to 18 years, *id.*, which the district court imposed.

20          In *Woodring*, the defendant pleaded guilty not only to destruction of an energy facility pursuant

21   to 18 U.S.C. § 1366, but also to arson and unlawful possession of a firearm.  *United States v. Woodring*,

22   4:13-cr-00326, Plea Agreement ECF Doc. 30 (E.D. Ark. Mar. 10, 2015).  According to a DOJ press

23   release, Woodring had engaged in several "attacks on Central Arkansas' power grid between August and

24   October of 2013. Those attacks included sabotaging an electrical support tower and downing a 500,000-

25   volt power line onto a railroad track near Cabot, Arkansas, which resulted in approximately $550,000

26   worth of damage; setting fire to and destroying an Extra High Voltage (EHV) switching station in Scott,

27   Arkansas, causing over $4,000,000 in damages; and cutting down two power poles, which led to the

28

DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE VARIANCE

1    temporary loss of power to approximately 9,000 people in Jacksonville, Arkansas."[8]

2    Woodring had a Total Offense Level of 22 but was in Criminal History Category II. *United*

3    *States v. Woodring*, 4:13-cr-00326, Sent. Trans. ECF Doc. 52 at 7:12-13 (E.D. Ark. Mar. 24, 2021).

4    Moreover, he was subject to a mandatory 10-year consecutive sentence. *Id.* at 7:14. This resulted in an

5    advisory sentencing range 166-177 months.  Also, his restitution amount—over $4.8 million—was over

6    twice what the Government alleges Mr. Smith should be ordered to pay.  *Id.* at 7:24.  Finally, while the

7    Court's 180-month sentence constituted a modest three-month upward departure, it was imposed

8    pursuant to a Fed. R. Crim. Proc. 11(c)(1)(C) binding plea agreement.  In short, Woodring agreed to that

9    sentence and modest upward variance.

10    Perhaps the most well-known of the cases cited by the Government, the defendant in *Reznicek*

11    "and fellow Iowan Ruby Montoya repeatedly vandalized construction sites connected to the 1,172-mile

12    pipeline in 2016 and 2017, setting a bulldozer on fire and using oxy-acetylene torches to damage

13    pipeline valves across Iowa. The total cost of the damage is not known, but in one incident in Buena

14    Vista County alone it was estimated at $2.5 million."[9] Unlike Mr. Smith, Reznicek and Montoya were

15    quite public in making clear their intentions were to intimidate or coerce the government.  *United States*

16    *v. Reznicek*, 4:19-cr-00172, Sent. Trans. at 40:12-15 ECF Doc. 167 (N.D. Iowa Aug. 2, 2021) ("the

17    defendant is stating what the intent was when she took the actions against the pipeline, and that is to

18    respond to the repeated failures of government as viewed by the defendant").

19    Accordingly, the Government's citation to *Reznicek* is troublesome because there the district

20    court imposed the upward adjustment pursuant to USSG §3A1.4, which increased the defendant's

21    offense level to 32 and placed her in Criminal History Category VI. It's troublesome because it suggests

22    that the Government believes Mr. Smith is qualitatively comparable to that case, which would violate

23    the Amended Plea Agreement.[10] In any event, despite an advisory sentencing range of 210 to 240

24    months, and the Government requesting a sentence of 180 months, the district court nonetheless varied

25

26    ⸻
       [8]  Available at https://www.fbi.gov/contact-us/field-offices/littlerock/news/press-releases/jason-
       woodring-pleads-guilty-to-federal-charges-related-to-attacks-on-power-grid.

27     [9] Available at https://www.desmoinesregister.com/story/news/crime-and-
       courts/2022/06/06/dakota-access-pipeline-dapl-protestor-sentence-jessica-reznicek/7535555001/.

28     [10] See Part IV below for a discussion of the Government's breach of the plea agreement.

downward substantially to 96 months because even that case because "this case is outside of the heartland of the typical terrorism case." *United States v. Reznicek*, 4:19-cr-00172, Sent. Trans. at 29:4-6; 64:10-11.  There can be no doubt that Mr. Smith's case is also far outside the heartland of a typical terrorism case.

In *McRae*, the defendant there, like the one in *Woodring*, pleaded guilty pursuant to a binding Rule 11(c)(1)(C) plea agreement and thus consented to imposition of a 96-month sentence either by way of application of USSG §3A1.4 outright or pursuant to Application Note 4.  *See United States v. McRae*, 2:16-cr-00566, Def's Sent. Memo. ECF Doc 171 at 1-2 (D. Utah July 18, 2019). In *Holeston*, a pre-*Booker* case and one which predates Application Note 4, the defendant's total offense level was 23 and his Criminal History Category was IV for a then-binding range of 70 to 87 months.  Not surprisingly, the district court imposed a sentence of 84 months.  *United States v. Holeston*, No. 00-4231, 2000 U.S. App. LEXIS 24909, *2 (4th Cir. 2000). Finally, in *Crahan*, while the defendant's total offense level was only 14, his Criminal History Category was IV.  Neither the terrorism adjustment or upward departure provision were at issue.  Despite an advisory range of 27 to 33 months, the Government requested a downward variance to 21 months, while the district court ultimately decided to vary downward to just 18 months. *United States v. Crahan*, 3:23-cr-05167, Gov't Sent. Memo. at 2 ECF Doc. 92 (W.D. Wash. Dec. 1, 2023).

In sum, none of these cases support a sentence of 151-months in this case for a 50-year-old Canadian citizen with ASD who simply sought to bring attention, albeit in a deeply misguided fashion, to the climate change crisis.  In none of these cases, most with worse facts than this, was an upward variance even imposed unless pursuant to a binding plea agreement.  If anything, these cases counsel for a significant downward variance.

2.    Only One § 1366 case has Ever Received the Upward Departure at App. Note 4

The undersigned could only locate a single case where a defendant was convicted of violating 18 U.S.C. § 1366 and received the upward departure pursuant to Application Note 4.  However, there, the defendant expressly agreed to the departure as part of his plea agreement, which also bound the district court.  In *United States v. Tibet Ergul*, 8:23-cr-00100 (C.D.CA), the 22-year-old defendant was sentenced to 72 months in federal prison on May 30, 2024, for his part in the firebombing of a Planned

Defendant's Sentencing Memorandum and
Motion for Downward Departure Variance

1   Parenthood clinic in Costa Mesa, California.  Ergul pleaded guilty to violating 18 U.S.C. § 1366(a) and

2   18 U.S.C. § 248(a)(3) (a Class A misdemeanor for intentional damage to a reproductive health service

3   clinic) by ***firebombing the clinic with a Molotov cocktail.***  Ergul also pleaded guilty to conspiracy to

4   damage an energy facility and intentional damage to a reproductive health services facility. He also

5   pleaded guilty to conspiring to take down the electrical grid for Orange County, California, in order to

6   start a race war.

7          As part of his plea agreement, which was binding under Rule 11(c)(1)(C), Ergul agreed to a five-

8   level upward departure pursuant to 5K2.0 (general departure provision) and 3A1.4. He also agreed to an

9   eight-level upward departure for "dismissed" conduct pursuant to 5K2.21 (arson). His total offense level

10  was 26 in CHC I for a range of 63-78 months. However, the parties agreed the court could impose a

11  sentence between 60 and 78 months.

12         According to Judge Cormac Carney at Ergul's sentencing, he "did not fit well with the teenagers

13  in Newport Beach and was bullied."[11] He also suffered from bipolar disorder, depression, an anxiety

14  disorder and ADHD.  Thus, while his crimes were abhorrent, dangerous, and motivated by a hateful

15  ideology, his mental health issues were clearly relevant to the ultimate outcome.

16         3.     The *Vail* case is Most Comparable to Mr. Smith's

17         A case not cited by the Government but which counsel believes is most comparable to Mr.

18  Smith's is that of Randy Scot Vail. *United States v. Vail*, 1:23-cr-00217 (D. Id. Jun 10, 2024). On June

19  10, 2024, in the District of Idaho, Vail (59) was sentenced to five years' probation and ordered to pay

20  restitution of nearly $550,000 after pleading guilty to violating one count of 18 U.S.C. § 1366(a) despite

21  the Government having argued for a sentence of 33 months. *United States v. Vail*, 1:23-cr-00217, USA's

22  Sent. Memo. at 1 ECF Doc. 54 (May 29, 2024).  Vail caused substantial damage to two hydroelectric

23  power stations with a firearm. The were "the largest generators of electricity in Idaho Power's service

24  territory." *Id.* at 3.

25                 Defendant's attack on the Hells Canyon Dam and the Brownlee Dam
                   hydroelectric power  stations were caused by Defendant's radical belief
26                 system and anti-government ideology, and not   because of his recent

27

28  _____
       [11] Paul Anderson, Daily Pilot, *Irvine man gets 6 years for Costa Mesa Planned Parenthood
    firebombing*, May 30, 2024, https://www.latimes.com/socal/daily-pilot/news/story/2024-05-30/irvine-
    man-gets-6-years-for-costa-mesa-planned-parenthood-firebombing.

1    diagnosis of bipolar disorder.  Defendant's words and actions reveal a man
2    with deep seated anger against the federal government, disdain for law
     enforcement and willingness to engage in violence for his misguided
     beliefs.

3    *Id.* at 9.

4           Vail's actions clearly were far more egregious than Mr. Smith's not only in scope, but also

5    because he committed the act while employees were onsite (although none were harmed).  Moreover,

6    Vail's motivations were far more nefarious than Mr. Smith's. In fact, the government presented

7    recordings of jail calls in which Mr. Vail repeatedly stated that "the government is 'illegitimate' and that

8    he did not recognize the authority of judges, sheriffs, the Governor, or the federal government."  His

9    hope, in his own words was to spark mass violence.  He wanted to "make a statement" and stated that

10   "we need a revolution or a civil war."  Unlike Smith, Reznicek and her co-defendant Montoya, and

11   many others whose motivation, however misguided, was to save lives, Vail advocated, through his

12   words and actions for mass chaos and death. Yet, despite all that, the Government did not seek a 3A1.4

13   adjustment or upward departure.

14          Instead, the Government sought a 33-month sentence.  So what motivated this recommendation?

15   It seems Vail's mental health played a significant part. Vail had recently been diagnosed with Bipolar I

16   disorder with Psychotic Features. Still, the Government asserted that Vail's mental illness was not a

17   mitigating factor. The district court disagreed.

18          4.    A Comprehensive Review of § 1366 Sentencings

19          Rather than cherry-picking a few cases, it is more informative to see what actually has happened

20   for sentences imposed on those convicted of violating 18 U.S.C. § 1366.  Pursuant to the U.S.

21   Sentencing Commissions publicly available datafiles,[12] from fiscal year 2006 through and include fiscal

22   year 2023 (the latest datafile available), nationwide there were 81 individuals sentenced having at least

23   one count of conviction for violating 18 U.S.C. § 1336. The following boxplot[13] illustrates the

24   distribution of sentences. The top of the blue box indicates the third quartile (27.0) months, and the

25   _____

26   [12] The undersigned retained SentencingStats.com to analyze the U.S. Sentencing Commission's
     data and provide the following analyses.

27   [13] Boxplots are sometimes used by the U.S. Sentencing Commission to visualize the distribution
     of sentences for a select group of individuals. *See* Sentencing Comm'n, *Inter-district Differences in
     Federal Sentencing Practices: Sentencing Practices across Districts from 2005-2017*, at 9-14 (Jan.
28   2020), available at https://www.ussc.gov/research/research-reports/inter-district-differences-federal-
     sentencing-practices.

DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE VARIANCE

bottom of the blue box indicates the first quartile (7.0 months).  Thus, half of all 81 defendants had

sentences between seven and 27 months. The median sentence indicated by the line bisecting the box

was just 16.0 months and the average indicate by the 'x' sitting atop the box was 27.1 months.  A

quarter of all defendants received a sentence of 16.0 months or less with 13 defendants receiving a non-

custodial sentence, i.e., no imprisonment, and one defendant receiving a single day.  The 'T' extending

above the box represents the upper limit of 57.0 months, meaning any sentences above 57.0 months are

considered outliers or statistical anomalies, i.e., they do not fit within the range of typical sentences.

Obviously, a sentence of 151 months would be a significant outlier.



C.    *Similarly Situated Individuals Generally Receive less than 36 Months*

        Two years ago, the Federal Judicial Center in conjunction with the U.S. Sentencing Commission

recently created a "Judicial Sentencing INformation" [sic] Platform (JSIN).[14]  The JSIN "provides five

years of cumulative data for people who were convicted of a similar or the same crime, have a similar

criminal history, and have been convicted of an offense that falls under the same sentencing

_____

[14] https://www.uscourts.gov/news/2023/01/25/judiciary-studies-use-online-tool-presentence-reports.

1  guideline."[15]  Dozens of district courts across the United States have begun to routinely incorporate the

2  results of JSIN runs into PSRs including those within the Eighth Circuit such as the Western District of

3  Arkansas, and the Northern and Southern Districts of Iowa.[16]

4  The PSR states that Mr. Smith's primary Guideline is USSG §2B1.1, his Total Offense Level is

5  22, and he is in Criminal History Category I with zero criminal history points. According to JSIN,[17]

6
7  > During the last five fiscal years (FY2019-2023), there were 479 defendants
   > whose primary guideline was §2B1.1, with a Final Offense Level of 22 and
   > a Criminal History Category of I, after excluding defendants who received
8  > a §5K1.1 substantial assistance departure. For the 462 defendants (96%)
   > who received a sentence of imprisonment in whole or in part, the average
9  > length of imprisonment imposed was 33 month(s) and the median length of
   > imprisonment imposed was 36 month(s). For all 479 defendants in the cell,
10 > the average sentence imposed was 32 month(s) and the median sentence
   > imposed was 34 month(s).

11 JSIN also reports that only 27% were sentenced within the advisory range, with only around 1%

12 receiving an upward variance.

13 The boxplot on the following page illustrates the sentencing distribution for 478 of the 479 cases

14 identified by JSIN.[18] As indicated, most individuals with Mr. Smith's identical Guidelines' calculation

15 receive a sentence between 24.0 and 41.0 months, meaning the vast majority received a below-range

16 sentence.  Notably, the upper limit is 65.0 months with only four outliers, i.e., those four sentences

17 above the upper limit.  Obviously, a 151-month not only be the highest sentence imposed by far on

18 similarly situated individuals over the past five fiscal years but a significant outlier.

19
20
21
22
23
24

---

25 [15] *Id.*

26 [16] *Id.*

27 [17] Available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

28 [18] JSIN utilizes a dynamic, non-public datafile, which sometimes contains more data than the static publicly released datafiles analyzed by SentencingStats.com.  Obviously, a single missing case does not make a material difference here.



In this regard, it is notable that sentences imposed under USSG §2B1.1 generally are now sentenced below the advisory range more often than not—marking a general trend toward increasing rates of downward variances since *Booker* as illustrated in the trend chart below.[19]  During that same period of time, the rate of above-range upward variances has remained rather steady increasing only modestly from 1.3% in 2006 to 2.4% in 2023.

---

[19] This chart covers 87,511 sentencings under USSG §2B1.1 in Criminal History Category I, but excluding any who received a downward departure pursuant to USSG §5K1.1.

With respect to upward variances, the average upward variance under USSG §2B1.1 has generally decreased from 21.3 months in 2006 to 16.3 months as of 2023, as shown by the following trend chart.  Thus, the Government's requested 100-month upward variance is over six times greater than what defendants receive in those rare circumstances where one is imposed.



A sentence of no greater than 36 months is more than sufficient to meet all the purposes of sentencing and is well within the actual range of sentences imposed on those similarly situated. Certainly, inasmuch as no upward variance is warranted, a sentence as absurdly high as 151 months would be manifestly unreasonable.

D.    *Mr. Smith Will Suffer Extraordinarily Onerous Conditions of Confinement*

Finally, as thoroughly detailed in the declaration of former BOP prison warden Maureen Baird, Mr. Smith can expect to experience extraordinary onerous conditions of confinement as a result of his ASD, various medical conditions – especially given the current state of disarray in the BOP.  Ex. 3. We do not have to guess about whether the BOP is equipped to care for and protect inmates under the best of circumstances.  Indeed, just a few days prior to this filing, the Acting Director of the BOP, Kathleen Toomey, testified before congress, stating: "Appropriately filling positions in every BOP facility is a top priority, because it is essential for the well-being of our employees and the safety of those in our care."[20]

---

[20] Appropriations Committee, Oversight Hearing of Feb. 26, 2025, available at

In other words, the fact that the BOP is ill-equipped to provide Cameron the special care and protection he needs, will make every hour of every day of his sentence exponentially more punitive. He will experience bullying and victimization. He will not receive adequate medical care. This is especially troubling given his deteriorating eye issues. He will likely spend much of his time in isolation. He will not be able to avail himself of the various programs offered under the First Step Act to citizens to reduce their time in custody. In the event this Court designates him a terrorist in any way, matters will be even worse for Mr. Smith as the BOP will designate him to at least a medium security facility, where he will be exposed to far more dangerous criminals than in lower security facilities. Finally, he will experience additional incarceration in ICE custody upon the completion of his BOP term. All of this information and more is contained in Ms. Baird's declaration.

### IV. NOT ONLY IS THE GOVERNMENT'S SENTENCING RECOMMENDATION UNREASONBABLE, IT LIKELY CONSTITUTES A BREACH OF THE PLEA AGREEMENT

Finally, Mr. Smith brings to the Court's attention that he believes the Government breached the Amended Plea Agreement (ECF Doc. 11) ("APA") on January 28, 2025 (the second day of the evidentiary hearing) regarding the applicability of Application Note 4 to USSG §3A1.4 to Mr. Smith's offense conduct. The parties clearly agreed in the APA that *only* Note 4 was possibly applicable due to the fact that there is no evidence that Mr. Smith intended any action against the government. The government did not adhere to that position at the hearing. Paragraph 13 of the APA states:

> *The United States will present evidence and recommend that the Court make a finding that the facts support an upward departure pursuant to USSG § 3A1.4 Application Note 4 and impose a 12-level upward departure and criminal history category I.*

Paragraph 15 of the APA states:

> *At sentencing . . . the United States will recommend a sentence of imprisonment within the Guideline sentencing range as the United States will advocate for in paragraphs 11-13 of this plea agreement.*

Toward the end of the hearing on January 28, 2025, this Court inquired of the Government: "What is the Government's thinking with regard to application of Note 4 instead of the victim-related adjustment [at USSG §3A1.4]?" Hearing Trans. at 242:18-20. On behalf of the Government, Mr. Hagler

https://appropriations.house.gov/schedule/hearings/oversight-hearing-federal-bureau-prisons.

DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE VARIANCE

responded:

> [W]e felt that the application Note 4 . . . was more appropriate under the facts and circumstances due mainly to the fact that these substations were . . . private entities. *I think the Court has a point about the fact that obviously some of this conduct could be addressed to maybe action or inaction of government entities and that they should do something different; and if you don't, you know, here's what's going to end up resulting. So I understand the Court's point on that. . . .* based on the facts and the circumstances and our negotiations in this case and what we have in our plea agreement, it is our position that we're ultimately asking the Court to apply application Note 4 and not the full departure, if you will, under 3A1.4.

*Id*. at 242:25-243:9 (emphasis added). The following exchange then transpired:

> THE COURT: So I don't know necessarily how the infrastructure of the United States' electrical system and energy system is set up, but I think for the most part it's privately owned. It's regulated by the government but it's privately owned. And I'm familiar with the Western Area Power Association. They've got a substation or something like that near my hometown. Is that a government entity? Western Area Power Association or is that, again, something that is owned by private entities and just regulated and managed by the government or do you even know that, Mr. Hagler?
>
> MR. HAGLER: I don't know that, Your Honor**. Again, *I think the Court has a valid point* that there's almost a hybrid aspect to this.** But, again, we viewed it as these particular victims in the case were private companies.

*Id*. at 243:15-244:3 (emphasis added).

Finally, the Court made the following observation regarding whether Mr. Smith's conduct was aimed at a civilian population—which would only support Application Note 4 at most, or whether his conduct was aimed at the Government—which would support application of the full upward adjustment at USSG §3A1.4 in its own right:

> I don't necessarily believe that the FBI has put their finger on exactly what might have promoted or prompted or maybe it's characterized differently, but we have all of that in the record, Mr. Passon. So I'm just wondering why this is trying to influence a civilian population. If you hold up a sign and say "end climate change now," that is trying to influence a civilian population because you're trying to – or you've stopped -- you stand in front of an interstate highway and inconvenience people in order to do that. You're getting public attention*. Here you're not getting anybody's attention but a power company but certainly the United States Government because you're impacting the essential infrastructure of a country by doing that.*

*Id*. at 247:12-24 (emphasis added).

By agreeing with the Court that it "has a point about the fact that obviously some of this conduct

1  could be addressed to maybe action or inaction of government entities" and that said point was "valid,"

2  the Government clearly invited this Court to consider applying USSG §3A1.4 to Mr. Smith outright

3  when it should have either stood silent or affirmatively argued against its application under any scenario.

4          As if that were not enough, the Government now invites this Court to commit legal error—also

5  in breach of the APA—by arguing in its sentencing memorandum that targeting "private companies"

6  and indirectly the "civilian customers they served" suffices for an upward departure pursuant to

7  Application Note 4.  ECF Doc. 130 at 15-16. In the APA, the parties expressly stated that the

8  Government could "present evidence and recommend that the Court make a finding that the facts

9  support an upward departure pursuant to USSG § 3A1.4 Application Note 4 and impose a 12-level

10 upward departure and criminal history category I."  APA at ¶ 13. Nowhere did the parties agree that

11 targeting private companies and indirectly their civilian *customers* suffices.

12         Ironically, the Government cites to *United States v. Reznicek*, No. 21-2548, 2022 U.S. App.

13 LEXIS 15461, 2022 WL 1939865 (8th Cir. June 6, 2022), in support of its contention.  But again,

14 *Reznicek* concerned application of USSG §3A1.4 outright and not Application Note 4. Thus, in citing

15 *Reznicek* the Government again appears to be suggesting to this Court that outright application of USSG

16 §3A1.4 is warranted. Such a suggestion plainly breaches the APA.  Moreover, the Eighth Circuit never

17 held in *Reznicek* that targeting private companies was sufficient to trigger USSG §3A1.4, let alone

18 Application Note 4.

19         Accordingly, in light of these breaches of the APA, Mr. Smith respectfully requests that the

20 Court disregard the Government's arguments evidenced it advanced at the evidentiary hearing, and

21 decline to impose either USSG §3A1.4 outright or the upward departure at Application Note 4.  In that

22 regard, it is notable that the Government fails to define, let alone establish, what constitutes a "civilian

23 population" for purposes of Application Note 4.  Even assuming that Mr. Smith's conduct "directly

24 targeted and affected civilians," that is not what is required by Application Note 4.  Indeed, under that

25 standard, then virtually any crime would fall under Application Note 4's umbrella.

26                                    **V.  CONCLUSION**

27         Mr. Smith was extremely misguided in his attempt to bring awareness to the climate change crisis

28 by vandalizing the electrical substations of private power companies. He sincerely regrets his conduct and

1    intends to make full amends. He is, however, no terrorist.  Notwithstanding the Government's breach of

2    the plea agreement inviting this Court to commit legal error, there is insufficient evidence supporting

3    application of either USSG §3A1.4 or an upward departure.

4        Accordingly, Mr. Smith prays that this honorable Court impose on him no more than 36-months'

5    imprisonment, no fine, no term of supervised release, and an appropriate amount of restitution.

6

7                                         RESPECTFULLY SUBMITTED,

8    Dated:  March 3, 2025.               DOUG PASSON

9

10                                         /s/ DOUG PASSON

11                                         Attorney for Defendant

12                                         CAMERON MONTE SMITH

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2025, the foregoing DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD  VARIANCE was filed electronically and a copy was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Doug Passon_____
DOUG PA