Doug Passon
Law Offices of Doug Passon, PC
10565 N. 114th St., Suite 101
Scottsdale, AZ 85259
Telephone: 480.448.0086
Email: doug@dougpassonlaw.com

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>v.<br><br>CAMERON MONTE SMITH,<br><br>              Defendant. | CASE NOS.  1:23-CR-118 (ND) and<br>                         1:24-CR-104 (SD)<br><br>**DEFENDANT'S RESPONSE TO UNITED STATES' SENTENCING MEMORANDUM**<br><br>COURT: Hon. Daniel M. Traynor |

Defendant CAMERON MONTE SMITH, by and through undersigned counsel pursuant to D.N.D. Crim. L. R. 32.1(B) hereby provides the Court with his Response to the United States' Sentencing Memorandum (ECF Doc. 130). The instant Response focuses solely on the Government's alleged amounts of loss and restitution.

**I.  LOSS IS DETERMINED BY RESTITUTION IN THIS CASE**

The Government's claims of loss and restitution are effectively the same. The Government claims that four victims are owed a total of $2,124,947.38 in restitution, which is comprised of damaged "materials and third-party services." ECF Doc. 130 at 5. The Government also claims that the loss attributable to Mr. Smith for purposes of calculating the advisory sentencing range is comprised of those same damaged "materials and third-party services," which it construes as "compensable," plus so-called "non-compensable damages" totaling $299,388.25. *Id.* at 3.

The Government wholly fails to explain or cite to any authority for its claim that "non-compensable damages" may be included in the calculation of loss, which makes no difference to the calculation of the advisory sentencing range in any event. Only actual or intended loss may be considered for purposes of calculating the advisory range. USSG §2B1.1(b)(1)(A). Whatever "non-

compensable damages" are, they are comprised of neither actual nor intended loss. Accordingly, the Court should disregard the Government's *ipse dixit* that non-compensable damages should be included in loss. In this case, therefore, determination of restitution simultaneously determines the loss amount.

## II. THE LAW OF RESTITUTION

"'The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.'" *United States v. Searing*, 250 F.3d 665, 667 (8th Cir. 2001) (quoting 18 U.S.C. § 3664(e)). The Government may not rely on the PSR alone as it "is not evidence." *Id.* (citing *United States v. Tucker*, 217 F.3d 960, 961 (8th Cir. 2000)). Moreover, "the government ha[s] the burden of proving that the [offense conduct] both directly and proximately caused the losses." *United States v. Sukhtipyaroge*, 1 F.4th 603, 607 (8th Cir. 2021).

> Once the court has identified the victims, the next step is to determine the full amount of each victim's losses. The appropriate measure of loss must be based on the amount of loss *actually* caused by the defendant's offense. Although a restitution award must be tied to actual loss, instead of prescribing a single method to be applied in all circumstances, the law contemplates discretion by the sentencing court in determining how to value a victim's losses. Consequently, the value of lost property under the MVRA must be determined in the district court's discretion depending on the circumstances of each case.

*United States v. Gammell*, 932 F.3d 1175, 1180 (8th Cir. 2019) (cleaned up; emphasis in original).

"Although the MVRA aims to make victims whole and compensate them for their losses, the MVRA does not allow victims to obtain double recovery ***or a windfall*** through restitution." *United States v. Nelson*, 106 F.4th 719, 724 (8th Cir. 2024) (citations omitted; emphasis added). A windfall has been defined by courts within this Circuit as "an unanticipated benefit, usually in the form of a profit not caused by the recipient," "a casual or unexpected acquisition or advantage, such as from an unexpected inheritance or by the negligence of others," or "an unexpectedly large or unforeseen profit." *Mitchell v. Barnhart*, 376 F. Supp. 2d 916, 921 (S.D. Iowa 2005). In that regard, some courts have found that even in criminal cases, victims have "a duty to mitigate" their losses. *United States v. Gamble*, No. 06-cr-247, 2007 U.S. Dist. LEXIS 27489, *16, 2007 WL 1114223 (D. Or. Apr. 12, 2007).

Finally, while sentencing factors generally may be determined by a preponderance of the evidence, USSG §6A1.3, the amount of restitution must be determined by a jury beyond a reasonable doubt. *Hester v. United States*, 586 U.S. 1104, 1106 (2019) (Gorsuch, J., dissenting from denial of cert.)

(Sotomayor, J., joining) ("the statutory maximum for restitution is usually zero, because a court can't award any restitution without finding additional facts about the victim's loss. And just as a jury must find any facts necessary to authorize a steeper prison sentence or fine, it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order"); *Rimlawi v. United States*, 2025 U.S. LEXIS 857, *1 (2025) (Gorsuch, J., dissenting from denial of cert.) ("it is difficult to see how a judge's factual findings might suffice to increase a criminal defendant's exposure to a restitution award"); *United States v. Carruth*, 418 F.3d 900, 906 (8th Cir. 2005) (Bye, J., dissenting) ("Once we recognize restitution as being a criminal penalty the proverbial *Apprendi* dominoes begin to fall. . . . [T]he statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.") (Cleaned up). A "district court's order imposing . . . restitution . . . violates the Sixth Amendment's jury guarantee" where the "amount [is] based upon facts not admitted to by [the defendant] or found by a jury beyond a reasonable doubt." *Carruth*, 418 F.3d at 906 (Bye, J., dissenting). Although Mr. Smith has waived his right to trial, he did not waive the burden of proof. Accordingly, as this Court has the discretion to do so under *Gammel*, this Court should use the beyond reasonable doubt standard when ascertaining the amount of restitution attributable to Mr. Smith.

In sum, this Court may only order restitution for those losses directly, proximately and *actually* caused by Mr. Smith's offense conduct, i.e., his shooting of the substations. This Court has discretion in determining how to assess those losses, which is the Government's burden to prove. In that regard, the Sixth Amendment requires this Court to impose a beyond a reasonable doubt standard on the Government, and in no event may this Court award restitution for losses that were not proximately caused by Mr. Smith's actual conduct or that would otherwise constitute a windfall to the victims herein.

### III.  THE REQUESTED RESTITUTION AMOUNT IS NOT BASED IN FACT OR LAW

At the evidentiary hearing, Mr. Smith called as an expert Mr. Nicholas Weber. His curriculum vitae was introduced as Defense Exhibit 200. Hearing Trans. at 165:23-25. Mr. Weber is a "managing partner at a security consulting firm, Archer International." *Id.* at 165:21-22. He was a North American Electric Reliability Corporation (NERC) Critical Infrastructure Protection (CIP) "auditor for Infrastructure Protection in the western region of North America. Before that I spent five years in

Department of Homeland Security, three in the military, and then two as a[n] electric sector specialist as a federal civilian, and 13 years of military service between Army National Guard Reserve and active service." *Id.* at 166:5-11.

According to Mr. Weber's testimony, **which went uncontroverted**, as conceded by Basin Electric, the repair to its transformer could have been done in place thereby reducing expenses considerably. Had the repairs been made in place rather than transporting and installing a replacement transformer, that would have reduced costs by approximately $727,000. *Id.* at 170:18-21 ("Q. Yeah, okay. So this invoice, this $727,000 invoice, this could have been avoided? A. If they would have repaired in place, it would have been avoided. Q. Okay. In total? A. **Total.**") (Emphasis added). Likewise, the $202,100 expense for filling oil into the transformers would have been cut in half had the repairs been done in place. *Id.* at 171:2-15.

Additionally, according to Mr. Weber's expert **uncontroverted testimony**, the catch basin for the South Dakota substation was "not adequate" for its purpose to contain any mineral oil that would spill out of the substation. *Id.* at 174:6. Indeed, the inadequacy of the catch basin was why neighboring land was contaminated with mineral oil from the substation. *Id.* at 174:23-175:2. Additionally, that land was also contaminated with gasoline and diesel, which contributed to the clean-up cost, but was not the result of Mr. Smith's offense conduct. *Id.* at 176:17-20. The gasoline and diesel apparently had already "been spilled there" and thus "had not been cleaned up prior to the event [i.e., Mr. Smith's offense conduct]." *Id.* at 177:4-5.

Thus, according to Mr. Webster's uncontroverted expert testimony, at least $828,050 could not be directly and proximately attributable to Mr. Smith's actual offense conduct. Such additional expenses were the result of the power companies' unilateral election to repair the damaged equipment off-site—which was not necessary. Thus, any award for unnecessary costs they elected to undertake would constitute a windfall to the victims.

Additionally, the remediation at the Carpenter site was $336,154.78, Gov't Bates Stamp 008080, while it was only $70,666.42 at Wheelock, Gov't Bates Stamp 004951. Clearly, the over 4.5 times greater clean-up cost for Carpenter than Wheelock was a direct result of the inadequate catch basin coupled with pre-existing contamination. Consistent with the evidence, this Court should therefore

reduce the Carpenter clean-up cost to an amount comparable to the cost of the Wheelock clean-up, which results in a further reduction of $265,488.36.  The following table summarizes these findings.

|  | Claimed compensable | Mr. Smith's Actual Liability |
|---|---|---|
| **Relocating two transformers** | $727,115.00 | $0.00 |
| **Replacing oil** | $202,100.00 | $101,050.00 |
| **Carpenter remediation** | $336,154.78 | $70,666.42 |
| ***Totals*** | ***$ 1,265,369.78*** | ***$171,716.42*** |

Thus, the requested $2,124,947.38 must be reduced by $1,093,653.36,[1] which results in a final restitution amount of no more than $1,031,409.02.

## V. CONCLUSION

In sum, in order to avoid imparting a windfall onto the victims and to avoid any speculation as to the damages directly and proximately caused by Mr. Smith's offense conduct, this Court should order Mr. Smith to pay no more than $1,031,409.02 in restitution and find that the loss amount attributable to him is the same to the extent this Court determines the Government met its burden of proof, i.e., beyond a reasonable doubt.

Dated:  March 7, 2025.

RESPECTFULLY SUBMITTED,

DOUG PASSON

/s/ DOUG PASSON

Attorney for Defendant
CAMERON MONTE SMITH

---

[1] This is the difference between the $1,265,369.78 claimed and the $171,716.42 that Mr. Smith actually should be held liable for.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2025, the foregoing DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE & VARIANCE was filed electronically and a copy was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Doug Passon
DOUG PASSON